# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### Dallas Division

| | | |
|---|---|---|
| INMAR RX SOLUTIONS, INC., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-2883-E |
| | ) | |
| MERRICK B. GARLAND *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| ─────────────────────────── | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*/s/ Simon Gregory Jerome*
SIMON G. JEROME
Trial Attorney
D.C. Bar No. 1779245
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. N.W., Room 12306
Washington, DC 20005
Tel:  (202) 514-2705
Fax:  (202) 616-8460
Email:  Simon.G.Jerome@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................1

**STATUTORY FRAMEWORK**................................................................................2

I.    Registration and Revocation under the Controlled Substances Act.................... 2

II.    Appointment and Removal of DEA ALJs ............................................................ 4

**BACKGROUND** ....................................................................................................**4**

**LEGAL STANDARD**.............................................................................................**6**

**ARGUMENT** .........................................................................................................**6**

I.    The DEA ALJ Removal Framework Is Constitutional. ...................................... 6

    a.    DEA ALJs are, at most, inferior officers. .................................................... 7

    b.    The removal protections for DEA ALJs allow for adequate presidential control............................................................................................. 9

    c.    *Jarkesy* does not compel a different conclusion. ........................................ 17

II.    Inmar Has Failed to Plead Prejudicial Injury Stemming from the Purportedly Unconstitutional Removal Provision.................................................. 19

**CONCLUSION**...................................................................................................**20**

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Soc. Sec. Admin.*,
  703 F.3d 538 (Fed. Cir. 2012) ................................................................. 15, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 6

*Bowsher v. Synar*,
  478 U.S. 714 (1986) .................................................................................... 9

*Burgess v. FDIC*,
  639 F. Supp. 732 (N.D. Tex. 2022) .......................................................... 20

*Calcutt v. FDIC*,
  37 F.4th 293 (6th Cir. 2022) ..................................................................... 14

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024) ................................................................................... 19

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
  51 F.4th 616 (5th Cir. 2022) ..................................................................... 19

*Collins v. Dep't of Treasury*,
  83 F.4th 970 (5th Cir. 2023) ................................................................ 6, 20

*Collins v. Yellen*,
  594 U.S. 220 (2021) ........................................................................... 4, 8, 19

*Decker Coal Co. v. Pehringer*,
  8 F.4th 1123 (9th Cir. 2021) ..................................................... 12, 13, 14, 17

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................................................. 8, 9

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ............................................................................. *passim*

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ......................................................................................... 2

*Humphrey's Ex'r v. United States,*
  295 U.S. 602 (1935)................................................................11, 12

*Jarkesy v. SEC,*
  34 F.4th 446 (5th Cir. 2022) ..................................................... *passim*

*Leachco, Inc. v. CPSC,*
  103 F.4th 748 (10th Cir. 2024) ..................................................... 14

*Lucia v. SEC,*
  585 U.S. 237 (2018).............................................................7, 12, 16

*Mahoney v. Donovan,*
  721 F.3d 633 (D.C. Cir. 2013) ..................................................... 15

*Morrison v. Olson,*
  487 U.S. 654 (1988)................................................................ *passim*

*Myers v. United States,*
  272 U.S. 52 (1926)..................................................................9, 10

*Nash v. Califano,*
  613 F.2d 10 (2d Cir. 1980) ......................................................... 15

*Seila Law, LLC v. CFPB,*
  591 U.S. 197 (2020)..................................................................7, 9

*Shurtleff v. United States,*
  189 U.S. 311 (1903)..................................................................... 4

*Soc. Sec. Admin. Dep't of Health & Hum. Servs. v. Glover,*
  23 M.S.P.R. 57 (1984)................................................................. 16

*Soc. Sec. Admin. v. Burris,*
  1988 WL 122632 (M.S.P.B. Nov. 3, 1988)................................. 16

*Soc. Sec. Admin., Dep't of Health & Hum. Servs. v. Manion,*
  19 M.S.P.R. 298 (1984)............................................................... 16

*Soc. Sec. Admin., Off. of Hearing & Appeals v. Anyel,*
  1993 WL 244051 (M.S.P.B. June 25, 1993) .............................. 15

*United States v. Arthrex,*
  594 U.S. 1 (2021)......................................................................7, 9

*United States v. Perkins,*
    116 U.S. 483 (1886) ............................................................................... 10

*Wiener v. United States,*
    357 U.S. 349 (1958) ............................................................................... 10

**STATUTES**

5 U.S.C. §§ 551-59 ..................................................................................... 3

5 U.S.C. § 556 ...................................................................................... 3, 12

5 U.S.C. § 1202 .......................................................................................... 4

5 U.S.C. § 3105 .......................................................................................... 4

5 U.S.C. § 7521 ................................................................................... *passim*

21 U.S.C. § 822 .......................................................................................... 2

21 U.S.C. § 823 .......................................................................................... 2

21 U.S.C. § 824 ................................................................................... 2, 8, 13

21 U.S.C. § 841 .......................................................................................... 2

21 U.S.C. § 877 .......................................................................................... 4

**RULES**

Fed. R. Civ. P. 12 ..................................................................................... 6

**REGULATIONS**

21 C.F.R. § 1301.11 ................................................................................... 2

21 C.F.R. § 1301.36 ................................................................................... 2

21 C.F.R. § 1301.46 ..................................................................... 4, 8, 14, 18

21 C.F.R. § 1309.43 ................................................................................. 13

21 C.F.R. § 1316.50 ................................................................................... 3

21 C.F.R. § 1316.42 ................................................................................ 3, 4

21 C.F.R. § 1316.52 ............................................................................3, 4, 12

21 C.F.R. § 1316.62 ..............................................................................14, 18

21 C.F.R. § 1316.65 ............................................................................3, 8, 18

28 C.F.R. § 0.100(b) ................................................................................... 2

## OTHER AUTHORITIES

Administrative Procedure Act—Legislative History,
  S. Doc. No. 248, 79th Cong., 2d Sess. (1946) .............................................. 15

Black's Law Dictionary (4th ed. 1951) ......................................................... 15

**INTRODUCTION**

Federal law requires distributors of certain controlled substances to obtain registration from the Drug Enforcement Administration (DEA).  If the DEA's Administrator comes to suspect that a registrant's operation is no longer in the "public interest," she is empowered to revoke that registration.  Here, the Administrator commenced the revocation process by serving Plaintiff Inmar RX Solutions, a DEA-registered reverse pharmaceutical distributor, with an order to show cause why its registration should not be revoked.  Under the DEA's regulations, Inmar is entitled to have its facts and legal arguments against revocation heard before an in-house administrative law judge (ALJ) before the Administrator renders a final decision.  Inmar exercised that right.

Thereafter, however, Inmar filed this suit, alleging that the DEA's ALJ hearing process is unconstitutional.  Specifically, Inmar claims that the ALJ overseeing its case enjoys removal protections that violate Article II and the separation of powers.  But its arguments are meritless.  ALJs exercise limited, adjudicatory duties subject to ample oversight by politically accountable officers, including removal for good cause.  Seen in its entirety, the framework in which DEA ALJs operate does not unduly inhibit the President's authority to execute federal law, nor is such a conclusion compelled by prior Fifth Circuit decisions.  And even if the statute protecting DEA ALJs from removal was constitutionally infirm, Inmar has not pleaded prejudicial injury from that statute. For either, independent reason, this suit should be dismissed.

## STATUTORY FRAMEWORK

### I.    Registration and Revocation under the Controlled Substances Act.

In the Controlled Substances Act, Congress set out a "comprehensive regime to combat the international and interstate traffic in illegal drugs." *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).  To that end, the Act makes it unlawful to manufacture, distribute, or dispense specified controlled substances without DEA registration.  21 U.S.C. §§ 822(a), 841(a)(1); 21 C.F.R. § 1301.11(a) (describing registration requirements); 28 C.F.R. § 0.100(b) (delegating the Attorney General's authority under the Act to the DEA).  In considering whether to authorize an applicant's registration, the DEA uses a set of statutory criteria, which include "the public interest," the applicant's compliance with state and local law, and "other factors as may be relevant to and consistent with the public health and safety."  21 U.S.C. § 823.

What the DEA may grant, the Act also authorizes it to revoke.  Should the agency conclude that an entity's registration no longer comports with the public interest, it may suspend or revoke that registration.  21 U.S.C. § 824(a)(4); *see also* 21 C.F.R. § 1301.36(a).  Per the DEA's regulations, the process of revocation begins with the DEA Administrator's issuance of an order to show cause,[1] 21 C.F.R. § 1301.36(d), which articulates the legal basis for the DEA's initiation of revocation proceedings, *id.* § 1301.37.  At the registrant's request, the DEA will provide a hearing, *id.* § 1301.36(d),

---

[1] Separately, and not implicated in this case, there exists a provision allowing for interim suspension of a registration pending the Administrator's final decision.  *See* 21 C.F.R. § 1301.36(e).

before a "presiding officer" (*i.e.*, an ALJ), *id.* §§ 1316.52, 1316.42(f), under the terms of the Administrative Procedure Act (APA), *id.* § 1301.41(a). *See also* 5 U.S.C. §§ 551-59 (describing APA procedures); *id.* § 556(b) (permitting an agency to conduct a hearing, or to delegate hearings to ALJs). During the revocation proceedings, the registrant may be represented by counsel, 21 C.F.R. § 1316.50; submit documentary and witness testimony to support its defense, *id.* §§ 1316.57-1316.59; obtain evidence (documents or witnesses) through subpoenas, *id.* § 1316.52(d); and present legal argument at the opening and close of evidence, *id.* § 1301.42—all with the ultimate purpose of affording the ALJ the opportunity to "receiv[e] factual evidence," *id.* As an ultimate matter, in any revocation proceeding, DEA bears "the burden of proving that the requirements for such revocation" are satisfied. *Id.* § 1301.44(e).

Revocation proceedings do not end with the ALJ, however. Rather, an ultimate decision on whether revocation is warranted rests with the Administrator. At the conclusion of his consideration of the facts and law, the ALJ "prepare[s] a report containing" his "recommended rulings on the proposed findings of fact and conclusions of law," "recommended findings of fact and conclusions of law, with the reasons therefore," and a "recommended decision." *Id.* § 1316.65(a). That report is "certified" to the Administrator, along with witness testimony transcripts, exhibits, and any exceptions to the ALJ's recommendations that the parties have taken. *Id.* § 1316.65(c). The Administrator herself, reviewing the entire record de novo, must thereafter issue a final order on the revocation, including findings of fact and

conclusions of law. *Id.* § 1301.46. Should the registrant desire judicial review of the Administrator's final order, the registrant may obtain it in an Article III court. *See* 21 U.S.C. § 877.

## II. Appointment and Removal of DEA ALJs

As explained above, the Administrator has (through DEA's regulations) delegated her authority to conduct hearings to "presiding officers," defined to mean ALJs. 21 C.F.R. §§ 1316.52 (empowering presiding officers to conduct hearings), 1316.42(f) (defining "presiding officer"). In turn, those ALJs are appointed pursuant to 5 U.S.C. § 3105. ALJs so appointed may only be removed "by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board," 5 U.S.C. § 7521(a), whose members are themselves removable by the President "only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 1202(d). Because the DEA is a component of the Department of Justice, DOJ's head (the Attorney General) is empowered to exercise that removal authority. *See id.* § 7521(a); *cf. Collins v. Yellen*, 594 U.S. 220, 248 (2021) ("When a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure." (citing *Shurtleff v. United States*, 189 U.S. 311, 316 (1903))).

## BACKGROUND

Plaintiff Inmar RX Solutions is a reverse pharmaceutical distributor based in Texas. Compl. ¶¶ 10, 17, ECF No. 1; *see also id.* ¶ 18 (defining "reverse pharmaceutical

distributor").  Due to the nature of its business operations, Inmar is required by the Controlled Substances Act to hold, as it presently does, a DEA registration.  *Id.* ¶ 34.

In September 2023, following months of investigation by the DEA, the agency commenced revocation proceedings against Inmar through an order to show cause.  *Id.* ¶ 2; *id.* ¶ 40 (describing an April 2021 site inspection to evaluate Inmar's inventory records, which revealed recordkeeping deficiencies); *id.* ¶ 44 (noting an April 2023 inspection of an Inmar facility, including a tour, a security review, and a targeted audit). The order to show cause listed four grounds that, in the agency's preliminary estimation, merited revocation of Inmar's registration:  (1) failure to comply with regulatory requirements regarding prompt delivery or destruction of controlled substances, *id.* ¶ 51; (2) inaccurate recordkeeping, *id.* ¶ 52; (3) misleading reports of theft and loss, *id.* ¶ 53; and (4) breach of an interim mitigation agreement Inmar had concluded with DEA, *id.* ¶ 54.  *See also* Exhibit A, Order to Show Cause.

Inmar responded by exercising its right to request an administrative hearing before an ALJ,[2] *see* Compl. ¶ 58, and with the present lawsuit, *see generally id.*  Alleging that the ALJ assigned to its administrative case, Chief ALJ (CALJ) John J. Mulrooney, II, is shielded from removal in violation of the separation of powers, Inmar seeks to enjoin the pending administrative proceedings, *id.* ¶ 66, along with a "declaratory judgment that the statutes, regulatory provisions, and policies providing for removal of

---

[2] On January 8, 2024, the ALJ presiding over Inmar's administrative proceedings entered a stay of those proceedings pending the outcome of this suit.  *See* Notice of Stay of Administrative Proceedings, ECF No. 12.

DEA ALJs are unconstitutional as applied by the DEA and DOJ," *id.* ¶ 69.

## LEGAL STANDARD

Dismissal of a complaint is appropriate under Rule 12(b)(6) where, even taking the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor, the complaint does not state a plausible claim to relief. *See* Fed. R. Civ. P. 12(b)(6); *Collins v. Dep't of Treasury*, 83 F.4th 970, 978-79 (5th Cir. 2023) ("*Collins II*") (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

### I.    The DEA ALJ Removal Framework Is Constitutional.

The Supreme Court has repeatedly approved of limited protections for inferior officers against removal by their politically accountable superiors. Assuming DEA ALJs are inferior officers, the statutory framework for their removal fits comfortably within the contours of what the Supreme Court has upheld; chiefly, they exercise limited, adjudicatory duties; their work is subject to politically accountable oversight; and their removal may be effected for "good cause," which balances their need for adjudicatory independence with the President's duty to execute federal law. The Fifth Circuit's decision in *Jarkesy v. SEC* did not announce a per se rule to the contrary, and is factually distinguishable in any event. The Court should dismiss the Complaint on this basis.

### a. **DEA ALJs are, at most, inferior officers.**

In evaluating the constitutional permissibility of removal restrictions for officers of the Executive Branch, the Supreme Court has tracked a distinction appearing in Article II between "principal" and "inferior" officers. *See Seila Law, LLC v. CFPB*, 591 U.S. 197, 217 & n.3 (2020). Congress has greater leeway to insulate inferior officers from removal, in light of a correspondingly lesser infringement on the President's ability to execute the law. *See id.* at 217 ("[W]e viewed the ultimate question as whether a removal restriction is of "such a nature that [it] impede[s] the President's ability to perform his constitutional duty." (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988))).

For present purposes, Defendants do not contest that ALJs within the DEA are inferior officers. *Cf. Lucia v. SEC*, 585 U.S. 237, 244-52 (2018) (holding that ALJs in the Securities and Exchange Commission are officers, not employees). Remarkably, in only a few sentences of skeletal argument, Inmar claims that *no* removal protections for DEA ALJs are permissible, apparently implying that those ALJs are principal officers. Compl. ¶ 63 ("Nor are they 'inferior officers with limited duties and no policymaking or administrative authority.' The role of DEA ALJs is not limited in duration, scope, or substance. DEA ALJs make policy on a case-by-case basis; indeed, one of their roles is to assess whether continued registration is in 'the public interest.' And they exercise substantial administrative authority in superintending adjudications." (internal citations omitted)).

The Supreme Court's recent decision in *United States v. Arthrex*, 594 U.S. 1 (2021),

squarely forecloses this argument. That case arose from an Appointments Clause challenge to the authority of Administrative Patent Judges (APJs) within the Department of Commerce. *Id.* at 8, 10. Although declining to "set forth an exclusive criterion for distinguishing between principal and inferior officers," *id.* at 23 (quoting *Edmond v. United States*, 520 U.S. 651, 661 (1997)), the Supreme Court found dispositive the fact that the APJs in question had the "'power to render a final decision on behalf of the United States' without any . . . review by their nominal superior or any other principal officer in the Executive Branch," *id.* at 14 (quoting *Edmond*, 520 U.S. at 665), and thus were principal officers.

Precisely the opposite is true in this case. Unlike the *Arthrex* APJs, DEA ALJs have no power to effect any final revocation. Instead, they certify a set of recommendations to the Administrator, 21 C.F.R. § 1316.65(a), who is responsible for issuing a final order, *id.* § 1301.46, and who is removable at will, *see Collins*, 594 U.S. at 248. *Contra* Inmar, it is difficult to imagine how an ALJ's responsibilities could be more carefully "limited in . . . scope [and] substance." Compl. ¶ 63. And far from *deciding* whether continued DEA registration is in the "public interest," *id.* (quoting 21 U.S.C. § 824), DEA ALJs make *recommendations* to the DEA Administrator, who renders a decision herself. In this way, DEA ALJs have an even stronger claim to inferior officer status than the judges of the Coast Guard Criminal Court of Appeals, whom the Supreme Court found in 1997 to be inferior officers—despite the gravity of their responsibilities—because their work was ultimately subject to review by the Judge

Advocate General and the Court of Appeals for the Armed Forces. *Edmond*, 520 U.S. at 664.

Ultimately, "[w]hat was 'significant'" to the outcomes in *Edmond* and *Arthrex* is significant here, too. *Arthrex*, 594 U.S. at 14 (quoting *Edmond*, 520 U.S. at 665)). DEA ALJs cannot take any final action with respect to revocation absent politically accountable approval, and so—like the *Edmond* judges, and unlike *Arthrex*'s APJs—they are, at most, inferior officers. *See id.* at 14; *Edmond*, 520 U.S. at 664-65.

### b. The removal protections for DEA ALJs allow for adequate presidential control.

Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. Because "[t]he entire 'executive Power' belongs to the President alone," the Supreme Court has found that executive "officers must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. That accountability "generally includes the ability to remove executive officials, for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Id.* at 213-14 (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)); *Myers v. United States*, 272 U.S. 52, 117 (1926) (the Constitution reserves to President the "power of removing those for whom he cannot continue to be responsible").

Despite this general presumption in favor of removability, for more than 130 years, the Supreme Court has recognized that inferior officers may enjoy some

protection from removal.  *See Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) ("Yet not all removal restrictions are constitutionally problematic.  'Inferior officers' may retain some amount of for-cause protection from firing." (citing *Morrison*, 487 U.S. at 691-92)).  In *United States v. Perkins*, 116 U.S. 483 (1886), an inferior officer in the Navy challenged his removal without cause as unlawful, as Congress had provided that such inferior officers could be removed in peacetime only pursuant to a court-martial sentence.  *Id.* at 483-84.  The Supreme Court agreed, holding that it "ha[d] no doubt" that Congress "may limit and restrict the power of removal" for inferior officers.  *Id.* at 485.  As the Supreme Court subsequently explained, this "legislative power" to regulate "removals in the case of inferior executive officers" flows from the Appointments Clause itself.  *Myers*, 272 U.S. at 127.  Just as the "power to remove" is traditionally considered "an incident of the power to appoint," so also "the power of Congress to regulate removals" is "incidental to the exercise of its constitutional power to vest appointment[]" power in the Heads of Departments.  *Id.* at 161.

The Supreme Court has also recognized that the scope of the President's constitutional power to remove and control adjudicators differs from the scope of his power to remove and control other executive officers.  For example, in *Morrison*, the Court observed that tenure protection may be "necessary to the proper functioning" of "an official performing 'quasijudicial' functions."  487 U.S. at 691 n.30; *see also Wiener v. United States*, 357 U.S. 349, 355-56 (1958) (holding that Congress could limit the President's power to remove members of the War Claims Commission, an

"adjudicatory body," because of "the intrinsic judicial character of the task with which the Commission was charged"); *Humphrey's Ex'r v. United States*, 295 U.S. 602, 629 (1935) (finding it "plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers" charged with "quasi-judicial" duties).

Of course, Congress does not have unlimited authority to shield officials wielding executive power, including adjudicators, from removal.  Under Article II, Congress cannot impose any restriction that prevents the President from ensuring that the laws are faithfully executed or "deprive[s] the President of adequate control" over the official's exercise of executive power.  *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010); *see also Morrison*, 487 U.S. at 658.  In deciding whether the President retains "adequate control" over the particular officer, two inquiries are relevant.  First, what is the nature of the executive power being exercised?  *See Free Enter. Fund*, 561 U.S. at 485 (officers in question had "expansive powers to govern an entire industry").  And second, what degree of control may the President exert over those officers' exercises of executive power?  *See id.* at 495-98 (invalidating removal restrictions for the above-described officers because of the President's inability to sufficiently superintend them); *see also Jarkesy*, 34 F.4th at 463-64 ("The question here is whether SEC ALJs serve sufficiently important executive functions, and whether the restrictions on their removal are sufficiently onerous, that the President has lost the ability to take care that the laws are faithfully executed.").

The nature of DEA ALJs' duties, and the avenues for politically accountable

control of their work, together make section 7521 a constitutionally unproblematic removal restriction.  Consider first the limited, adjudicatory responsibilities DEA ALJs exercise with respect to revocation.  They may schedule hearings and conferences, require parties to submit written briefs, issue subpoenas, examine witnesses, rule on evidence, and rule on procedural matters.  21 C.F.R. § 1316.52; *see also* 5 U.S.C. § 556.  These responsibilities are quintessentially adjudicatory (or "quasi-judicial"), and thus deserving of some protection from interference.  *See Morrison*, 487 U.S. at 691 n.30; *Humphrey's Ex'r*, 295 U.S. at 629.  They are also an order of magnitude different than those the Supreme Court found troubling in *Free Enterprise Fund*, where the officers in question had "expansive powers to govern an entire industry," 561 U.S. at 485, including the power to require annual fees, to "regulate every detail of an accounting firm's practice," to promulgate "auditing and ethics standards," to inspect private firms, and to initial investigations and disciplinary proceedings, *id.*  DEA ALJs' responsibilities are even significantly more restricted in scope than those of the Securities and Exchange Commission's ALJs, which the Fifth Circuit highlighted in invalidating section 7521 as applied to them.  *See Jarkesy*, 34 F.4th at 464 (noting that, in addition to powers similar to those described above, SEC ALJs could "punish contemptuous conduct," and that "often their decisions are final and binding" (citing *Lucia*, 585 U.S. at 248)); *see also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133 (9th Cir. 2021) (in upholding section 7521 as applied to Department of Labor ALJs, finding material that "the ALJ here was performing a purely adjudicatory function in deciding the . . . claim." (citing *Free Enter.*

*Fund*, 561 U.S. at 507 n.10)).

As to the second inquiry, DEA ALJs are subject to ample oversight. *See Free Enter. Fund*, 561 U.S. at 595-98. Most centrally, the Administrator could exercise the ultimate oversight by taking ALJs out of the revocation process entirely. There can be no separation-of-powers problem where, as here, the Executive Branch—not Congress—has itself chosen to use a tenure-protected officer in a decisionmaking process. *Id.* at 497 ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents . . . The President can always choose to restrain himself in his dealings with subordinates." (internal citations omitted)). The CSA empowers the Administrator herself (through a delegation of power from the Attorney General) to revoke a registration. 21 U.S.C. § 824. In turn, the involvement of an ALJ is a matter of the agency's own choice, not Congress'. 21 C.F.R. § 1309.43; *see Decker Coal*, 8 F.4th at 1133 ("Congress did not overstep here. No statute mandates that the DOL employ ALJs in adjudicating BLBA benefits claims."). If the President wished to exert control over CSA registration, he could order the DEA Administrator—who is removable at will—to change the regulation providing for ALJ involvement. *See Decker Coal*, 8 F.4th at 1134 ("The President has broad executive power to order the Secretary of Labor to change DOL's regulatory scheme and remove ALJs from the adjudicatory process[.]").

Even had the DEA not obligated itself to use ALJs, the Administrator maintains political accountability through her oversight and decisionmaking role in revocation

proceedings.  For a final decision on revocation to issue, the involvement of the DEA Administrator is not just permitted, but *required*, by DEA's regulations.  21 C.F.R. § 1301.46.  In other words, unlike the SEC's ALJs, whose decisions are "often" "final and binding," *Jarkesy*, 34 F.4th at 464 (citation omitted), DEA ALJs' decisions are not. Moreover, parties need not wait until the end of a process they view as flawed to obtain review from purportedly objectionable rulings:  the same regulations explicitly make interlocutory review available from the politically accountable DEA Administrator.  21 C.F.R. § 1316.62.  Analogous schemes in other agencies have led courts to find section 7521 constitutionally sound as applied to agencies other than the SEC.  *See Decker Coal*, 8 F.4th at 1134; *Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024), *pet. for cert. docketed*, No. 24-156 (U.S. Aug. 9, 2024); *see also Calcutt v. FDIC*, 37 F.4th 293, 319 (6th Cir. 2022) ("Even if relief were available, we doubt Calcutt could establish a constitutional violation from the ALJ removal restrictions [at § 7521]."), *rev'd on other grounds*, 598 U.S. 623 (2023) (per curiam).

As an additional element of presidential control, courts have looked to the difficulty of removing a particular officer.  In *Free Enterprise Fund*, for example, the Supreme Court noted, in invalidating a statutory scheme providing for two layers of for-cause protection, that the standard protecting the officers there was "unusually high," in contrast to an "'ordinary' dual for-cause standard."  561 U.S. at 502-03; *see also Decker Coal*, 8 F.4th at 1135 (considering this factor).  Here, in contrast, it is precisely the ordinary "good cause" standard that applies to the Attorney General's removal of

DEA ALJs.

The "good cause" standard strikes a constitutionally adequate balance between presidential removal authority and the need for ALJs' decisional independence. *See Nash v. Califano*, 613 F.2d 10, 15 (2d Cir. 1980); *see also Mahoney v. Donovan*, 721 F.3d 633, 635 (D.C. Cir. 2013). At the time of the APA's enactment, the term was understood to refer simply to a "[s]ubstantial" or "[l]egally sufficient ground or reason." Black's Law Dictionary 822 (4th ed. 1951). When specifically referring to employer actions, the term's conventional meaning "include[d] any ground which is put forward by authorities in good faith and which is not arbitrary, irrational, unreasonable or irrelevant to the duties with which such authorities are charged." *Id.* There is no reason to believe that Congress, in enacting section 7521, intended to deviate from that well-understood meaning. *See* Administrative Procedure Act—Legislative History, S. Doc. No. 248, 79th Cong., 2d Sess., at 326 (1946) ("[t]he cause found must be real and demonstrable," and based on "facts and considerations warranting the finding").

In practice, the MSPB has interpreted "good cause" broadly. *See Abrams v. Soc. Sec. Admin.*, 703 F.3d 538, 543 (Fed. Cir. 2012) (deferring to MSPB's interpretation of "good cause" in section 7521, which "includ[es] all matters which affect the ability and fitness of the ALJ to perform the duties of office"). For example, "good cause" may be found based on (i) "adjudicatory errors," *Soc. Sec. Admin., Off. of Hearing & Appeals v. Anyel*, 1993 WL 244051 (M.S.P.B. June 25, 1993), (ii) deficient "performance, including performance during the course of an adjudicatory proceeding," *id.*, (iii) inappropriate

"actions taken by [an ALJ] in the course of an adjudicatory proceeding," *Soc. Sec. Admin. Dep't of Health & Hum. Servs. v. Glover*, 23 M.S.P.R. 57, 76 (1984), (iv) "insubordinate and unreasonable refusal to carry out [an ALJ's] primary function of hearing and deciding cases," *Soc. Sec. Admin., Dep't of Health & Hum. Servs. v. Manion*, 19 M.S.P.R. 298, 303 (1984), (v) "failure to follow instructions," *Abrams*, 703 F.3d at 543, and even (vi) abuse of "free mail privileges," because it is "unlawful" and "call[s] into question [the ALJ's] qualifications to serve in a judicial role," *Soc. Sec. Admin. v. Burris*, 1988 WL 122632 (M.S.P.B. Nov. 3, 1988), *aff'd sub nom. Burris v. Soc. Sec. Admin., Dep't of Health & Hum. Servs.*, 878 F.2d 1445 (Fed. Cir. 1989). Thus, unlike with the officers in *Free Enterprise Fund*, it appears that "cheat[ing] on . . . taxes," 561 U.S. at 503, could provide good cause for removing an ALJ. Critically, the Supreme Court itself suggested that ALJ removal restrictions are meaningfully distinct from those applicable to the Board at issue in *Free Enterprise Fund. See id.* at 506 ("the employees referenced by the dissent" do not "enjoy the same significant and unusual protections . . . as members of the [PCAOB]"); *see also id.* at 536 (Breyer, J. dissenting) (referencing "administrative law judge[s]"); *Lucia*, 585 U.S. at 261 (Breyer, J. concurring in part) (the "Free Enterprise Fund Court" stated that "[ALJs] were distinguishable from the [PCAOB] members" because many "perform adjudicative . . . functions" and they do not "enjoy the same significant and unusual protections"). These broad interpretations mean that, in practice, "good cause" strikes an adequate balance between independence and accountability to their superiors.

All told, to paraphrase the Ninth Circuit, DEA's "ALJs are judges who make decisions that are subject to vacatur by people without tenure protection." *See Decker Coal*, 8 F.4th at 1135. In DEA's case, those decisions are tentative at best—final decisions, as discussed, must come from the Administrator herself. As a whole, DEA's ALJ structure ensures ample oversight of the exercise of executive power, even with the protections of section 7521. Article II requires no more.

### c. *Jarkesy* does not compel a different conclusion.

Despite the foregoing, Inmar would treat the outcome of this case as a foregone conclusion. To its eye, *Jarkesy* established a per se rule that "Article II 'forbids' ALJs, as 'officers,' from operating with 'two layers of for-cause protection.'" Compl. ¶ 61 (quoting *Jarkesy*, 34 F.4th at 465). But the Fifth Circuit in *Jarkesy* said no such thing. In fact, the Fifth Circuit itself appropriately included two steps in its inquiry: "whether SEC ALJs serve sufficiently important executive functions, and whether the restrictions on their removal are sufficiently onerous, that the President has lost the ability to take care that the laws are faithfully executed." *Jarkesy*, 34 F.4th at 463-64. The number of layers of for-cause removal is just part of that equation. If the Fifth Circuit meant only to examine whether two layers of for-cause protection shielded the SEC's ALJs from removal, it presumably would have started (and ended) its analysis there. But instead, it examined the functions of SEC ALJs, *id.* at 464, and the degree to which two layers of for-cause removal protection interfered with presidential control, *id.* at 465. This analysis is consistent with the Supreme Court's own approach to removal questions,

which examines the ultimate question (presidential control) with reference to (1) officers' specific responsibilities and (2) the methods by which the President can exert control, including through removal. *See Free Enter. Fund*, 561 U.S. at 495-506; *Morrison*, 487 U.S. at 685-97. And the Fifth Circuit invalidated section 7521's two layers of for-cause protection with respect to SEC ALJs only after accounting for those ALJs' particular powers, including their contempt powers and the fact that their decisions are "often . . . final and binding." *Jarkesy*, 34 F.4th at 464.

Not only did *Jarkesy* not establish a per se rule against two layers of for-cause removal, but its facts are materially distinguishable, making its holding inapplicable here. To be sure, the Fifth Circuit confronted the same statute as is relevant here. *See id.* at 464 (citing 5 U.S.C. § 7521). But the officers in question there, SEC ALJs, exercised different responsibilities with distinct, and more restricted, avenues for presidential oversight. In particular, the Fifth Circuit focused on the fact that SEC ALJs had the power to punish contempt and to render decisions that were "often . . . final and binding." *Id.* (citation omitted). Here, in contrast, the DEA ALJs exercise much more circumscribed powers—in effect, they assist the Administrator to compile a record for review. 21 C.F.R. § 1316.65(c). Their work is subject both to (mandatory) final and (discretionary) interlocutory review, offering the Administrator sufficient opportunity to correct any deficiencies she perceives in their work. *Id.* §§ 1301.46, 1316.62. *Jarkesy* is thus not determinative of the outcome here.

## II.    Inmar Has Failed to Plead Prejudicial Injury Stemming from the Purportedly Unconstitutional Removal Provision.

Even if the removal protections applicable to the DEA's ALJs created a separation-of-powers problem, the complaint should still be dismissed because Inmar has not pleaded injury from that supposed defect.  That error is fatal.

A plaintiff challenging a removal restriction may only obtain relief when the challenged restriction "inflict[ed] compensable harm" on the plaintiff.  *Collins*, 594 U.S. at 259.  That is so because an unconstitutional removal provision "does not strip" the officer "of the power to undertake the other responsibilities of his office."  *Id.* at 258 n.23.  In other words, the "mere existence of an unconstitutional removal provision . . . generally does not automatically taint Government action by an official unlawfully insulated."  *Id.* at 267 (Thomas, J., concurring).

Under Fifth Circuit precedent, three harm-related showings are required.  The President or agency head must have a "substantiated desire" to remove the "unconstitutionally insulated actor."  *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022) ("*CFSA*"), *rev'd on other grounds sub nom. CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024), *reinstated in relevant part*, 104 F.4th 930 (5th Cir. 2024) (per curiam) (mem.).  Despite that desire, the President or agency head must have a "perceived inability to remove the actor due to the infirm provision."  *Id.*  And finally, there must exist "a nexus between the desire to remove and the challenged actions taken by the insulated actor."  *Id.*  These showings are required whether the relief sought is

retrospective, as in *Collins* itself, or prospective, as in *Community Financial Services Association*, 51 F.4th at 631.  Were the published decision in *Community Financial Services Association* (and indeed, the Supreme Court's decision in *Collins* itself) insufficient, the Fifth Circuit reaffirmed its approach in the *Collins* remand.  *Collins II*, 83 F.4th at 982-83 (applying *CFSA* in the motion-to-dismiss context); *see also Burgess v. FDIC*, 639 F. Supp. 732, 746 (N.D. Tex. 2022) (applying *CFSA*).

Inmar has not met this bar; indeed, it has not even mentioned the requirement. To obtain relief here, it would need to plead that (1) the President (or Attorney General) desires to remove CALJ Mulrooney; (2) he perceives he cannot do so because of section 7521; and (3) but for section 7521, the President or Attorney General would have removed CALJ Mulrooney and this proceeding would have been dismissed (or not commenced in the first instance).  *See Collins II*, 83 F.4th at 982; *CFSA*, 51 F.4th at 632. Its failure to contend with this requirement means that its complaint must be dismissed. *See Collins II*, 83 F.4th at 982-83 ("This means that plaintiffs must allege sufficient facts plausibly to claim that 'but for the removal restriction' the Trump Administration would have exited the conservatorships and returned the companies to private control. Considering all facts asserted in the amended complaint, plaintiffs fail to make that showing." (internal citation and footnote omitted)).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion to dismiss the Complaint.

Dated:  September 6, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*/s/ Simon Gregory Jerome*
SIMON G. JEROME
Trial Attorney
D.C. Bar No. 1779245
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. N.W., Room 12306
Washington, DC 20005
Tel:  (202) 514-2705
Fax:  (202) 616-8460
Email:  Simon.G.Jerome@usdoj.gov

*Counsel for Defendants*

**Certificate of Word Count**

I hereby certify that this motion contains 5,318 words, including footnotes, and omitting the case caption, table of contents, table of authorities, signature block, and these certificates.

*/s/ Simon Gregory Jerome*


**Certificate of Compliance with Part II.C of the Court's Standing Orders**

I hereby certify that I have complied with the notification requirement of Part II.C of the Court's Standing Orders.  On August 30, I sent this motion to dismiss to Plaintiff's counsel to advise them of the anticipated bases of the motion.  September 6 (today) marks the seventh day since that notification. Plaintiff has not filed a notice of intended amendment to its Complaint.

*/s/ Simon Gregory Jerome*